725 A.2d 635

**STATE of Maryland**

v.

**Francisco RODRIGUEZ.**

**No. 237, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

March 5, 1999.

430

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Gwen C. Kinsey, Jr., Asst. Atty. Gen., Baltimore,

and Marna McLendon, State's Atty. for Howard County, Ellicott City, on the brief), for appellant.

George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellee.

Byron L. Warnken, Law Offices of Bonnie L. Warnken, Baltimore, Counsel for Amicus Curiae, Virginia Wolf, Maryland Troopers Ass'n, Inc., National Law Enforcement Officers' Rights Center of the Nat. Ass'n of Police Organizations, Inc., Concerns of Police Survivors, Inc., Stephanie Roper Foundation, Inc., Maryland Coalition Against Crime, Inc.

Argued before MURPHY, C.J., and HOLLANDER and KENNEY, JJ.

MURPHY, Chief Judge.

In this appeal from the Circuit Court for Howard County, the State seeks to set aside its plea agreement with Francisco Rodriguez, appellee. For the reasons that follow, we shall dismiss the State's appeal.

## FACTS

On March 29, 1990, in Howard County, Corporal Ted Wolf of the Maryland State Police was murdered by Eric Tirado, whose conviction for that offense was affirmed by this Court in *Tirado v. State*, 95 Md.App. 536, 622 A.2d 187 (1993), *cert. denied*, 331 Md. 481, 628 A.2d 1067 (1993). Francisco Rodriguez, the appellee in this case, was an accomplice to the murder and was also charged with first degree murder and related offenses.

When Tirado's case was brought to trial in the Circuit Court for Howard County, Rodriguez was incarcerated on unrelated charges in a New York correctional facility. While Tirado's trial was underway, a Howard County Assistant State's Attorney ("the Assistant") and a Maryland State Police Detective traveled to New York to meet with Rodriguez and his attorney, Robert Morin, now an Associate Judge of the Superior Court for the District of Columbia. Rodriguez agreed to be

interviewed provided that anything he said would not be used against him in subsequent criminal proceedings. According to the State, Rodriguez acknowledged during this interview that he was present when Tirado shot Corporal Wolf, but claimed that the shooting had been a complete surprise to him. At this point, a plea agreement was discussed but was not then finalized. Rodriguez was transported to Howard County as a possible witness in Tirado's trial, but he was never called to testify.

At Tirado's trial, his friend Edgar Devarie testified as follows:

> Tirado told Devarie that he shot a police officer. Tirado explained to Devarie that he and Rodriguez were travelling from Virginia through Maryland in a stolen car, and that he was speeding. Tirado told Devarie that he stole the car because he did not have enough money to get back to New York.
>
> According to Devarie, Tirado told him that a State trooper pulled over the stolen car, and after talking with Tirado, walked back to his vehicle with Tirado's license and registration. At that point, Tirado and Rodriguez discussed who would kill the officer. Tirado said, "I'll do it." Rodriguez handed Tirado a .357 magnum and Tirado "put it in his pants." The trooper then told Tirado and Rodriguez to come to his vehicle, and Tirado got in the front passenger seat of the police vehicle and Rodriguez got in the back. . . . Tirado then pulled out the gun and shot Corporal Wolf. Tirado told Devarie that the trooper "straightened up, opened his eyes." Because "he didn't know where the first bullet went," Tirado shot the trooper a second time in the head.
>
> Tirado went on to tell Devarie that, after he shot the trooper, he took the ticket book, his driver's license, and other papers. He then "cleaned up a bit and he ran." The two men got back in the stolen car and drove to the next exit and abandoned the vehicle. As they ran away, they

burned Corporal Wolf's ticket book because it had Tirado's name on it.[1]

The Tirado jury also heard the prior recorded statements of another witness who claimed that Rodriguez " 'hates police,' " and that before Tirado and Rodriguez left Virginia for New York she heard Rodriguez say that " '[h]e was so mad that if somebody got in his way or stopped—or stopped him he would kill the person.' " [2] This witness added that she also overheard Rodriguez say " 'I have nothing to lose, I'm going to jail.' " [3]

Tirado's appeal was pending in January of 1992 when the Assistant and the Detective Sergeant again met with Rodriguez and Morin. The State alleges that at this time Rodriguez amended his statement to conform more to the evidence adduced at Tirado's trial. Thereafter, the State and Rodriguez negotiated the following plea agreement:

## PLEA AGREEMENT

The Defendant, Francisco Rodriguez, (hereafter "the Defendant") and the State of Maryland (hereafter "the State"), hereby agree to the following matters:

1. This plea is offered pursuant to Rule 4–243, of the Maryland Rules of Procedure, in that the parties and the Court agree to bind themselves to the conditions described hereafter, prior to the acceptance of the plea.

2. The Defendant will withdraw his previously entered plea of not guilty and enter a plea of guilty to one count of first-degree murder (aiding and abetting).

3. Upon acceptance of the plea, the Defendant will waive his right to have a Pre–Sentence Report prepared and the Court will sentence the Defendant to life imprisonment, the

---

1. *Tirado v. State*, 95 Md.App. 536, 542–43, 622 A.2d 187, *cert. denied*, 331 Md. 481, 628 A.2d 1067 (1993).

2. *Id.* at 543, 622 A.2d 187.

3. *Id.*

sentence beginning as of June 12, 1991. The sentence shall run concurrently with any other sentence and specifically shall run concurrently, subject to the terms of this Agreement, especially paragraph # 5, to the sentence received by the Defendant pursuant to his conviction in the United State District Court of the Eastern District of Columbia.

4. After sentencing, the Defendant will file a motion for reconsideration of sentence which motion will be taken under advisement of the Court.

5. Under this Agreement, the Defendant agrees to make himself available as a witness to the State to provide truthful testimony about the events concerning the death of Maryland State Trooper Theodore Wolf, at any re-trial of co-defendant Eric Tirado (hereafter "the co-defendant"). The parties aver that previously the Defendant has given an oral statement concerning the death of Trooper Wolf. The parties agree that the Defendant will have complied with the terms of this agreement that he give truthful testimony if called as a witness he testifies truthfully and consistent with the substance of his oral statement. Should Defendant fail to comply with the requirements of this paragraph, this agreement is voided, such that the sentence imposed on the Defendant will be life imprisonment consecutive to Defendant's Federal sentence as referenced in paragraph # 3. If this Agreement is voided, the Defendant shall receive no credit with regard to the life imprisonment sentence for the incarceration time served in the Federal System so that the life sentence shall be imposed to run consecutively to said Federal time.

6. Upon affirmance on direct appeal by the highest court (the Maryland Court of Special Appeals or by the Maryland Court of Appeals or the United States Supreme Court if certiorari is granted by either), of the co-defendant's conviction after exhaustion of all appellate remedies, or upon completion of any retrial of the co-defendant, the parties agree that the Defendant's sentence will be modified to life imprisonment all but fifteen (15) years suspended, the sen-

tence beginning as of June 12, 1991, to run concurrently with any sentence.

The agreement is signed by the Assistant who negotiated it on behalf of the State, by Rodriguez's counsel, and by Rodriguez.

On January 24, 1992, the agreement was presented to the circuit court judge who had presided over the Tirado trial. The Assistant informed the court:

> Your Honor I would indicate on the record that the State is recommending the disposition that it has surveyed and reflected and judged to be necessary with respect to the State's interest in the prosecution with regard to the death of Corporal Wolf and the State is recommending that the Court accept the terms and conditions of the plea agreement pursuant to that which has been worked out by counsel. That the State's Attorney's Office feels it's necessary and important that this case be disposed of in this manner to insure that the appropriate resolution of all these cases takes place.

In presenting the court with a statement of facts in support of the guilty plea the Assistant who had negotiated the agreement identified witnesses, including Edgar Devarie, who would be called if the case were brought to trial. The Assistant then summarized, in pertinent part:

> Your Honor, testimony would show that in the early morning hours of March 29, 1990, this Defendant, Francisco Rodriguez, ... was travelling in the passenger's seat of a stolen Toyota driven by Eric Tirado, travelling northbound on Interstate 95 in Howard County, Maryland. This vehicle had been stolen in Virginia by Defendant Rodriguez, Tirado and another individual in order that Rodriguez and Tirado could return to New York in time [for] a meeting with their probation officer that morning. In the vicinity of the intersection of Interstate 95 and Maryland Route 32 Maryland State Police Corporal Theodore Wolf on routine patrol in a Maryland State Police vehicle ... observed the speeding Toyota driven by Tirado and attempted to engage a stop of the vehicle. This was eventually accomplished so that the

two vehicles came to a stop approximately under the overpass of eastbound Maryland Route 175 at Interstate 95, that still being in Howard County, Maryland.

Your Honor, during the course of the Toyota coming to a stop the Defendant Francisco Rodriguez and Eric Tirado engaged in conversation. Eric Tirado stated that the trooper who was pulling them over would have to be killed. Eric Tirado then obtained from Francisco Rodriguez a 357 caliber long barrelled handgun. The Defendant Rodriguez followed Tirado back to Corporal Wolf's vehicle and during the course of the stop with [sic] Rodriguez sitting in the right rear passenger's seat and Eric Tirado seated in the front passenger seat. Then Eric Tirado removed the 357 handgun and fired the gun at near contact range at Corporal Wolf.

After confirming that it had reviewed the victim impact statements, the court declared that it was "satisfied that the plea that's been recommended by the State's Attorney is appropriate, that the plea incorporated in the agreement is appropriate." At the request of both parties, the agreement was placed under seal. On March 11, 1992, pursuant to the plea agreement, Rodriguez filed the contemplated motion for reconsideration of sentence.

Tirado's convictions were affirmed by this Court on April 2, 1993. *Tirado v. State*, 95 Md.App. 536, 622 A.2d 187 (1993). On August 20, 1993, the Court of Appeals denied Tirado's petition for writ of certiorari. 331 Md. 481, 628 A.2d 1067 (1993). Thus, Tirado was never retried and Rodriguez was never called upon to testify against him.

No further action was taken in the case until August 1, 1997, when the parties appeared before the circuit court for a hearing on the motion for reconsideration of sentence. The plea agreement was removed from under seal, but the hearing was continued when the State indicated a desire to "investigate and consider a legal theory ... that would potentially lead to the State filing a Motion to set aside the plea agreement...." On August 25, 1997, the Howard County State's

Attorney filed a request for the appointment of a special prosecutor, asserting that the aforementioned investigation would require the interview of at least one Assistant State's Attorney still with her office,[4] and that a special prosecutor was needed "to avoid the appearance of any prejudice, or conflict of interest. . . ." According to an October 10, 1997 docket entry, "State orally assigns case to special prosecutor . . ." During the October 10 hearing, in open court, the Special Prosecutor, filed an answer to Rodriguez's motion for reconsideration of sentence, contending that the plea agreement had been procured by fraud. The hearing was then continued once again. On October 21, 1997, the State asserted substantially the same allegations in an amended answer signed by both the Special Prosecutor and the State's Attorney. On November 14, 1997, the State filed a motion under Md. Rule 4–345(b), as well as a supporting memorandum, asking the court to "void the Plea Agreement and vacate the current disposition and judgment in the case" due to fraud, and to "either grant a new trial or resentence the Defendant pursuant to a mutually [agreed] upon, harsher sentence, as provided for in the Plea Agreement. . . ."[5] That motion was also signed by both the Special Prosecutor and the State's Attorney for Howard County.

A hearing on both motions was held on December 18, 1997. The State contended that the prosecution and the defense had collaborated to procure the court's approval of the plea agreement by withholding pertinent information that, if revealed, might have resulted in the court's refusal to accept the agreement. In the alternative, the State argued that even if the court did not conclude that the plea agreement was procured by fraud the court could not modify Rodriguez's sentence pursuant to the plea agreement until Rodriguez had

---

4. Shortly after the plea agreement had been accepted, the Assistant who negotiated it left the State's Attorney's Office to pursue another job opportunity.

5. An additional memorandum in support of the State's position was filed on behalf of Trooper Wolf's widow.

exhausted all remedies provided by the Maryland Post Conviction Procedure Act.[6]

As the court summarized, the State specifically contended that the court was not told:

1) That Rodriguez had given two totally contradictory statements to the State, one during the course of the Tirado trial in July 1991; and the other on January 13, 1992 at the State Police Waterloo facility.

2) That Edgar Devarie, the State's "star witness" against Tirado, would be available as a witness at any potential retrial of Tirado.

3) That Rodriguez was transported to Howard County during the course of the Tirado trial as a potential witness, but never testified.

4) Certain relevant facts concerning Rodriguez's conduct just hours before the murder of Cpl. Wolf.

5) Rodriguez's recent adult criminal history in New York.

6) That Cpl. Wolf's wife and family were vehemently opposed to the terms of the plea agreement.

7) That the sealing of certain information in the case may well have been orchestrated to accomplish ulterior motives, other than ensuring security .... "perhaps insulating the Court from the truth prior to the January 24, 1992 guilty plea."

The State also contended that, several days after the murder, Rodriguez told his girlfriend that he "ordered" Tirado to shoot Corporal Wolf.

The court held the matter *sub curia* and, on January 14, 1998, issued a written opinion in which it concluded that under Maryland law a plea agreement cannot be rescinded after the defendant has been sentenced, and added that even if it were to disregard [the law] and consider the effect of fraud and misrepresentation upon the plea agreement in the

---

6. *See* Md.Code (1958, 1996 Repl.Vol., 1998 Cum.Supp.), Art. 27, §§ 645A—645J.

instant case, it would still deny the relief requested by the State. The basic position of the State is that its representatives and to some extent, representatives of the Defendant, committed fraud and/or mislead the Court into accepting the plea agreement in the instant case. Assuming without deciding, that such was the case, it would be unconscionable to afford the State the relief it requests.

The State argues that the plea agreement should be rescinded and the Defendant subjected to a re-trial. To do so would reward the State for its misdeeds. If the State was a participant in a fraud committed upon the Court, it should not benefit from its conduct. . . . In a civilized society, we seek to discourage such conduct; not to reward it. The fact that the State may have acted in concert with the Defendant makes its conduct no less objectionable.

The court also

made no finding that representatives of the State or Defendant fraudulently induced or mislead the Court into accepting the plea agreement in the instant case. Had such occurred, however, the court would be powerless to rescind the plea agreement at this time. . . .

As to the State's alternative contention that Rodriguez's sentence could not be modified under the agreement until Tirado exhausted all of his post conviction remedies, the court concluded that the plea agreement was ambiguous. It therefore ordered that an evidentiary hearing be held "to afford the parties an opportunity to present evidence concerning the intention of the parties at the time the plea agreement was made."

At the resulting hearing held on February 20, 1998, Rodriguez called both the Assistant and Judge Morin. The Assistant testified that it was his understanding that the agreement contemplated truthful testimony on the part of Rodriguez "should there be any retrial of Mr. Tirado as a result of the *direct* appellate process." (Emphasis added.) He explained: "I recall no discussion with regard to post conviction proceedings. And in fact, it certainly was not in contemplation of my

mind with respect to that." Similarly, Judge Morin testified that the plea agreement called for Rodriguez to testify if Tirado was retried as the result of a direct appeal. He recalled: "It was specifically discussed between myself and [the Assistant] that this would not apply in any post conviction relief...." In contrast, the State called the Detective Sergeant and Trooper Wolf's widow, who testified that when the plea agreement was described to them, no distinction was made between a retrial after a direct appeal and a retrial after a post conviction proceeding. After hearing the testimony, the court stated:

> The signatories to the agreement are [the Assistant], Mr. Morin and the Defendant, ... and to me as fact finder the unrebutted testimony ... that I've heard here is that the intention of the parties was that after any direct appeal was over or after any retrial was occasioned by virtue of a direct appeal, that would only occur if there was a reversal on appeal, Mr. Rodriguez would be entitled to modification of the sentences.

The court granted Rodriguez's motion for reconsideration of sentence and modified the sentence to be life with all but 15 years suspended, to run concurrently with a federal sentence that Rodriguez is currently serving.

### ISSUES

The State contends that it has the right to appeal the sentence modification order under the authority of the common law and Code (1974, 1998 Repl.Vol.), § 12–302 of the Courts and Judicial Proceedings Article. It argues that "[t]he [trial] court erred in determining that it was powerless to disturb a plea agreement on the basis of fraud or misrepresentation...." In the alternative, the State argues that the trial court erred in determining "that Rodriguez was entitled to a present reduction of sentence."

Rodriguez has moved to dismiss the State's appeal on the ground that it is not authorized by § 12–302 or the common law. We must grant that motion.

## DISCUSSION

### Appealability

 Rodriguez's motion to revise his sentence in accordance with the plea agreement was filed pursuant to Md. Rule 4–345(b). The State expressly stated that its motion to void the plea agreement and vacate the sentence imposed was also filed pursuant to that rule. Rule 4–345(b) provides:

> The court has revisory power and control over a sentence upon a motion filed within 90 days after its imposition . . . in a circuit court, whether or not an appeal has been filed. Thereafter, the court has revisory power and control over the sentence in case of fraud, mistake, or irregularity. . . .

As a general rule, "[a] motion to modify or reduce a sentence is directed to the sound discretion of the trial court and is not appealable." *State v. Strickland,* 42 Md.App. 357, 359, 400 A.2d 451 (1979). *See also Smith v. State,* 31 Md.App. 310, 321–22, 356 A.2d 320, *cert. denied,* 278 Md. 735 (1976).

 The State's appeal to this Court was brought pursuant to § 12–302 of the Courts Article and the common law. Section 12–302 directs, in pertinent part:

. . .

(c) In a criminal case, the State may appeal as provided in this subsection.

(1) The State may appeal from a final judgment granting a motion to dismiss or quashing or dismissing any indictment, information, presentment, or inquisition.

(2) The State may appeal from a final judgment if the State alleges that the trial judge failed to impose the sentence specifically mandated by the Code.

(3) . . . In a case involving a crime of violence as defined in § 643B of Article 27, and in cases under §§ 286 and 286A of Article 27, the State may appeal from a decision of a trial court that excludes evidence offered by the State or requires the return of property alleged to have been seized in violation of the Constitution of the United States, the Con-

stitution of Maryland, or the Maryland Declaration of Rights....

. . .

Code (1974, 1998 Repl.Vol.), § 12–302(c) of the Courts and Judicial Proceedings Article. Contrary to the State's contention, it is clear that the statute does not authorize an appeal from a ruling on a Rule 4–345(b) motion.

As the Court of Appeals has explained, § 12–302 codifies "the State's right of appeal in certain circumstances, but [does] not . . . strip the State of rights already established by the common law." *Cardinell v. State*, 335 Md. 381, 395, 644 A.2d 11 (1994). The common law provides that the State may appeal a sentence imposed by the trial court when the court has acted without jurisdiction. *See id.* (holding State had common law right to appeal trial court's reduction of sentence when circuit court acted without jurisdiction by granting Rule 4–345(b) motion that had not been timely filed). *See also State v. Webster*, 119 Md.App. 585, 705 A.2d 151 (holding State had common law right to appeal grant of defendant's Rule 4–345(b) motion when circuit court acted without jurisdiction by modifying a mandatory sentence), *cert. granted*, 350 Md. 274, 711 A.2d 867 (1998). We have not been directed to case law setting forth any other established common law right,[7] and we are convinced that no right exists that would permit an appeal in the instant case.

The Court of Appeals was faced with a similar situation in *Chertkov v. State*, 335 Md. 161, 642 A.2d 232 (1994). Chertkov was convicted and sentenced pursuant to a binding plea agreement. The trial court subsequently granted her Rule 4–345(b) motion to revise her sentence, vacated the judgment against

---

**7.** Pursuant to Md. Rule 8–511, an amicus brief in support of the State's position was filed with this Court by: Corporal Wolf's widow, Virginia Wolf; the Maryland Troopers Association, Inc.; the National Law Enforcement Officers' Rights Center of the National Association of Police Organizations, Inc.; Concerns of Police Survivors, Inc.; the Stephanie Roper Foundation, Inc.; and the Maryland Coalition Against Crime, Inc.

her, and entered probation before judgment. The State appealed and Chertkov moved to dismiss the appeal. After this Court denied the motion to dismiss and reversed the judgment of the trial court, *see State v. Chertkov,* 95 Md.App. 104, 619 A.2d 556 (1993), the Court of Appeals granted *certiorari.* The Court ultimately dismissed the appeal, although it observed, in *dicta,* that "a court that binds itself to fulfill [a] plea agreement thereby relinquishes his or her right to modify the sentence, thereby imposed, absent the consent of the parties . . . ." 335 Md. at 174, 642 A.2d 232. It explained:

By modifying the sentence, the [trial] court did not act *sans* jurisdiction. . . . It has long been well established that, in Maryland, trial courts have inherent power to modify their judgments both in civil and criminal cases. . . . Initially, the power existed only during the term in which the order was entered. That power is now codified in Maryland Rule 4–345(b). . . . Furthermore, the modified sentence fell within the permitted range of sentences for the particular offense; but for the plea agreement, the modified sentence would be immune from attack on illegality ground. Consequently, it is quite clear that the court's modification of its sentence, notwithstanding its effect on a binding plea agreement, is not illegal in the sense that the court acted without jurisdiction.

*Id.* at 170, 642 A.2d 232.

According to the State, the circuit court erred in determining that, regardless of fraud, it had no discretion to modify a plea agreement once accepted. Without citation to any authority, the State suggests that, by erroneously concluding that it had no authority to exercise discretion, the court "place[d] itself outside its proper jurisdiction. . . ." The circuit court, however, made clear that even if it could "consider the effect of fraud and misrepresentation upon the plea agreement . . . , it would still deny the relief requested by the State" on the ground that it would be "unconscionable" to "reward the State for its misdeeds." Thus, the court's decision did not rest solely on its determination that it could not set aside a plea agreement once accepted.

Even assuming *arguendo* that the court's decision was based solely on its determination that it had no authority to set aside the plea agreement, and assuming *arguendo* that that determination was erroneous, the State has no right of appeal. It is true that "when a trial court has discretion to act, it must exercise that discretion," *Colter v. State*, 297 Md. 423, 426, 466 A.2d 1286 (1983). It does not follow, however, that a court acts without jurisdiction when it erroneously fails to exercise discretion. A trial court acts without jurisdiction when it acts without " 'inherent or common law authority, nor any authority by virtue of statute or rule....' " *Webster*, 119 Md.App. at 598–99, 705 A.2d 151 (quoting *Cardinell*, 335 Md. at 391, 644 A.2d 11). The circuit court was authorized to rule on Rodriguez's motion to revise the sentence, as well as on the State's motion to void the plea agreement and vacate the sentence, and that is precisely what the court did. *See* Code (1974, 1998 Repl.Vol.), § 1–501 of the Courts and Judicial Proceedings Article; Md. Rule 4–345(b).

Because the State's appeal is not authorized by § 12–302 of the Courts Article or by the common law rule permitting an appeal when a trial court has acted without jurisdiction, we must grant Rodriguez's motion to dismiss the appeal. We address the State's substantive arguments to make clear our conclusion that the circuit court's decision was correct.

### Modification of Plea Agreement Induced by Fraud

The circuit court determined that it could not modify a plea agreement once accepted, regardless of whether the agreement was induced by fraud. The court added that even if it could modify a plea agreement because it had been induced by fraud, it would be "unconscionable" to do so in the instant case, where the party seeking to have the agreement modified contended that *it* played a major role in the perpetration of the fraud. The State now contends that "the trial court was simply incorrect in its legal assumption that it was powerless to grant relief on the basis of possible ... fraud...." It further contends that, because the court was required to make an independent assessment of the plea agreement before

accepting it, it is of no consequence that the fraud was allegedly perpetrated by a party now seeking to have the agreement set aside.

We are convinced that the court's ultimate determination, that the State may not seek to modify a plea agreement based on its *own* fraud, was correct.[8] Plea bargaining plays an important role in criminal jurisprudence in this State and elsewhere. *See generally* Md. Rule 4–243. In *State v. Brockman*, 277 Md. 687, 692–93, 357 A.2d 376 (1976), the Court of Appeals explained:

> The simple fact is that today plea agreements account for the disposition of an overwhelming percentage of all criminal cases.... If this were not so, but rather every case entailed a full-scale trial, state and federal courts would be flooded, and court facilities as well as personnel would have to be multiplied many times over to handle the increased burden.... These agreements, however, also serve other needs besides preventing, or at least relieving, the overcrowding of our courts. As the Supreme Court of the United States noted in *Santobello* [*v. New York*, 404 U.S. 257, 261, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) ], the termination of charges after plea negotiations
>
> > "leads to [the] prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pretrial confinement for those who are denied release pending trial; it protects

---

**8.** Because this is a case in which the State seeks judicial relief from its own (alleged) fraud, we are not presented with the question of whether a party who has been victimized by fraud can have set aside a judgment based on a plea agreement produced by a fraud perpetrated by the adverse party. In *Banks v. State*, 56 Md.App. 38, 49, 466 A.2d 69 (1983), however, this Court commented in *dicta* that a plea agreement "procured by the defendant's fraud does not bar subsequent prosecution.... Nor is a plea agreement binding if it is induced by misrepresentation." (Citations omitted.) *See also Mayes v. Galley*, 858 F.Supp. 490, 495 (D.Md.1994) (citing a string of federal cases and stating that "[i]t is well-established that regardless of whether a sentencing court has previously accepted a plea agreement and bound itself to the agreement's contemplated disposition, when there is a fraud on the court, the court is no longer bound").

the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned." Additionally, plea agreements eliminate many of the risks, uncertainties and practical burdens of trial, permit the judiciary and prosecution to concentrate their resources on those cases in which they are most needed, and further law enforcement by permitting the State to exchange leniency for information and assistance. . . . All in all, it is our view that plea bargains, when properly utilized, aid the administration of justice and should be encouraged.

(Citations omitted.) In *Brockman*, the State withdrew a plea agreement after the defendant had substantially performed his part of the bargain. The Court explained why the State had no right to do so: "We think that when a plea bargain has been agreed to by both a proper representative of the State and a defendant, and is not in violation of any law or public policy of this State, it would be a grave error to permit the prosecution to repudiate its promises in a situation in which it would not be fair and equitable to allow the State to do so." *Id.* at 698, 357 A.2d 376.

■ There is a strong public policy that favors finality of a judgment obtained as a result of bargaining. In *Skok v. State*, 124 Md.App. 226, 721 A.2d 259 (1998), a defendant entered into an agreement that called for him to enter a plea of *nolo contendere*. When accepting the plea, the trial court failed to comply with the dictates of Md. Rule 4–242(c), which requires that the court give to the defendant an "on the record" explanation of the consequences of a *nolo contendere* plea. Under section (f) of the rule, a defendant may move within ten days of imposition of sentence to set aside the judgment based on the court's failure to comply with section (c). The defendant in *Skok* waited more than three years before he filed a motion pursuant to 4–331(b) for new trial based on fraud, mistake, or irregularity. The circuit court denied the motion and this Court affirmed. We explained:

If a defendant in a criminal case were able, with impunity, to ignore the time limits set forth in Rule 4–242(f) and simply file a motion for a new trial whenever it suited his or her convenience, convictions based on guilty pleas or pleas of *nolo contendere* would be forever in legal limbo and the public policy favoring finality of judgments would be thwarted. We hold that a defendant who files a motion for new trial to set aside a guilty plea or a *nolo contendere* plea must allege facts showing that he/she has acted with ordinary diligence and good faith. Here, appellant does not allege in his motion[ ] that he was *ever* ignorant of the fact that the court below had failed to comply with Rule 4–242. Appellant gives no hint in his motion as to why he waited over three years after the judgment was final before filing a new trial motion, nor does he set forth any fact showing that he acted in good faith or with due diligence.

*Skok,* 124 Md.App. at 244, 721 A.2d 259.

 Like Rule 4–331(b), Rule 4–345(b) permits a court to · take belated action in the case of fraud, mistake, or irregularity. Like the defendant in *Skok,* moreover, the State was aware from the start of the facts that formed the basis for its motion. The State waited from January of 1992 until October of 1997 to raise the issue of fraud. The State did not file its motion to void the plea agreement until November 14, 1997. By waiting to challenge the agreement until after it became clear that there would be no retrial of Tirado and that the testimony contemplated by the agreement would not be necessary, the State has shown neither good faith nor ordinary diligence.

 We recognize that the plea agreement contemplated continuing jurisdiction in the circuit court, in that the parties and the court anticipated that Rodriguez would move for a revision of his sentence and that the motion would eventually be heard. Nevertheless, when Rodriguez's guilty plea was accepted, a final judgment was in fact entered against him. We therefore apply the well established principle that "[t]he type of fraud necessary to vacate an enrolled judgment is

extrinsic fraud, not fraud which is intrinsic to the trial of the case itself." *Tandra S. v. Tyrone W.,* 336 Md. 303, 315, 648 A.2d 439 (1994). *See generally Reid v. State,* 305 Md. 9, 17, 501 A.2d 436 (1985) (applying the intrinsic/extrinsic fraud analysis in a criminal case). As the Court of Appeals has explained,

> Intrinsic fraud ... is not a basis for vacating an enrolled decree under "the principle that, once parties have had the opportunity to present before a court a matter for investigation and determination, and once the decision has been rendered and the litigants, if they so choose, have exhausted every means of reviewing it, the public policy of this State demands that there be an end to that litigation."

*Id.* (citation omitted) (emphasis omitted).

> "Intrinsic fraud is defined as '[t]hat which pertains to issues in the original action or where acts constituting fraud were, or could have been, litigated therein.' Extrinsic fraud, on the other hand, is '[f]raud which is collateral to the issues tried in the case where the judgment is rendered.'

> "Fraud is extrinsic when it actually prevents an adversarial trial. In determining whether or not extrinsic fraud exists, the question is not whether the fraud operated to cause the trier of fact to reach an unjust conclusion, but whether the fraud prevented the actual dispute from being submitted to the fact finder at all."

*Tandra S.,* 336 Md. at 316, 648 A.2d 439 (citations omitted).

Here, the alleged fraud did not prevent the parties from appearing before the court and presenting their positions. It merely caused the court to reach what the State now contends was an unjust conclusion—acceptance of the very agreement that the State had promoted. As such, the alleged fraud was akin to intrinsic fraud which cannot supply the basis for setting aside a judgment after trial and appeal.

The propriety of the circuit court's refusal to set aside the plea agreement is underscored by the paucity of the State's proffer regarding fraud. In particular:

— The State pointed out that the plea agreement did not reveal that Rodriguez made a prior statement in which he minimized his guilt, and argued that had the court known of the prior statement it might have concluded that his testimony would be too unreliable to support the plea bargain.

We are satisfied, however, that having presided over Tirado's trial, and having been informed by the Assistant that Rodriguez and Tirado had stolen a car in order to drive back to New York in time to meet with their probation officers, the circuit court was made well aware that Rodriguez was anything but a model citizen.

— The State contended that the trial court may have been under the mistaken impression that Rodriguez's testimony would be necessary in any retrial of Tirado because Edgar Devarie was no longer available to testify.

To the contrary, there was no suggestion that Devarie would be unavailable. In fact, the prosecutor informed the court that Devarie would testify if Rodriguez were tried.

— The State asserted that the trial court might have questioned the value of Rodriguez's testimony if it had known that Rodriguez was transferred to Howard County during the Tirado trial but was never called to testify.

This assertion ignores the fact that no plea agreement with Rodriguez had been finalized at that point. Moreover, it was not unreasonable for the State to protect itself against the chance that Tirado's convictions would be vacated.

— The State argued that the trial court might not have approved the agreement had it known the extent of Rodriguez's culpability, *ie.*, that hours before the murder of Corporal Wolf Rodriguez stated he would kill anyone who got in his way, and shortly after the murder he told his girlfriend that he "ordered" Tirado to commit the offense.

The circuit court was well aware of the extent of Rodriguez's culpability, having presided over Tirado's trial. In addition, the court had been expressly informed that Rodriguez and Tirado had stolen a car in order to meet with their

probation officers on time, and that Rodriguez had handed Tirado the murder weapon just before the shooting took place.

— The State posited that, had the court known the nature and extent of Rodriguez's criminal record, it might not have approved the agreement.

The court knew that, at the time of the murder, Rodriguez was on probation and was nevertheless carrying a gun. The State certainly had every opportunity to present the court with Rodriguez's complete criminal record.

— The State contended that the court's decision might have been different had it known that Corporal Wolf's family opposed the terms of the plea agreement.

The court read the victim impact statements before accepting the plea.

— Finally, the State proffered that, although the parties requested that the plea agreement be sealed in order to protect Rodriguez, they actually had the ulterior motive of "insulating the Court from the truth."

As we have seen, the court was *not* insulated from the truth. The State utterly failed to proffer any evidence that would entitle it to renege on a legitimate agreement that was carefully negotiated and knowingly entered into, but which ultimately resulted in a windfall for Rodriguez when Tirado's convictions were affirmed on appeal.

### Exhaustion of Remedies

The State argues, in the alternative, that the hearing on Rodriguez's motion to modify his sentence was premature, and that the circuit court therefore erred in granting the motion. The State points to paragraph 6 of the plea agreement, which provides:

Upon affirmance on direct appeal by the highest court (the Maryland Court of Special Appeals or by the Maryland Court of Appeals or the United States Supreme Court if certiorari is granted by either), of the co-defendant's conviction after exhaustion of all appellate remedies, or upon completion of any retrial of the co-defendant, the parties

agree that the Defendant's sentence will be modified to life imprisonment all but fifteen (15) years suspended, the sentence beginning as of June 12, 1991, to run concurrently with any sentence.

The State argues that "although Tirado has completed a direct appeal which ... was obtained via an initial post conviction petition," he "still has available a final remedy in the state appellate courts, *ie.*, appeal from a denial of a motion to reopen the post conviction proceeding." The State concludes that, "[a]ccording to the plain language of the plea agreement, Rodriguez is thus not entitled to a present sentence reduction because Tirado has further review available to him in the state appellate courts."

 In the memorandum opinion issued after the December 18, 1997 hearing, the circuit court concluded that paragraph 6 of the plea agreement was ambiguous and ordered that a hearing be held on the matter. That decision was correct. As the court recognized, a plea agreement is a contract between the defendant and the State, and the general rules for the construction of contracts apply. *See Ogonowski v. State*, 87 Md.App. 173, 183–84, 589 A.2d 513, *cert. denied*, 323 Md. 474, 593 A.2d 1127 (1991). It is well-established that

"where a contract is plain and unambiguous there is no room for construction and it must be presumed that the parties meant what they expressed." ... Where, however, "doubt arises as to the true sense and meaning of the words themselves or *difficulty as to their application under the surrounding circumstances,* the sense and meaning of the language may be investigated and determined by evidence *dehors* the instrument."

"[I]t is equally well settled that where a question arises as to the general intention of the parties, concerning which the instrument is not decisive, proof of independent facts collateral to the instrument, may be admitted." ... and "if any doubt arises from the language of a contract as to the intention of the parties, extraneous evidence may be admitted to aid the court in comprehending its meaning"....

*Canaras v. Lift Truck Services, Inc.,* 272 Md. 337, 350, 322 A.2d 866 (1974) (citations omitted) (emphasis in original). "An interpretation which makes a contract fair and reasonable will be preferred to one which leads to either a harsh or unreasonable result." *Id.* at 357, 322 A.2d 866.

As the circuit court pointed out, under the State's interpretation of paragraph 6, Rodriguez would not be entitled to enforcement of the plea agreement so long as Tirado has the potential to obtain a new trial by *any* means. Section 645A(a)(2)(iii) of Article 27 provides no time period within which a defendant must file a petition to re-open a post conviction proceeding. Thus, the court quite correctly pointed out that the State's interpretation of paragraph 6 would lead to the absurd result that Rodriguez might "never be entitled to relief during Tirado's incarceration."[9] The court added, again correctly, that the language of paragraph 6 did not conclusively establish the propriety of Rodriguez's position that his sentence was to be modified after Tirado's conviction was affirmed on direct appeal or after any retrial following a direct appeal. Thus, the evidentiary hearing ordered by the court was entirely appropriate.

As we have explained, both the former Assistant and defense counsel testified that the plea agreement contemplated only affirmance on direct appeal or a retrial following a direct appeal. It is obvious that the circuit court was entitled to accept this testimony.

**APPEAL DISMISSED; COSTS TO BE PAID BY HOWARD COUNTY.**

---

**9.** The circuit court also pointed out that, under the State's broad interpretation of paragraph 6, Rodriguez's sentence could not be modified until Tirado had exhausted any federal *habeas corpus* relief to which he was entitled. As long as the petitions are not duplicative, "there is no limit on the number of times a prisoner may petition for federal habeas corpus relief." *Thanos v. State,* 332 Md. 511, 536, 632 A.2d 768 (1993) (concurring and dissenting opinion); and there is no way to determine in advance when or whether a defendant will recognize an issue that can be asserted in a federal court. *See generally 28 U.S.C.A. § 2244 (1948, 1994 Repl.Vol., 1998 Cum.Supp.).*