819 A.2d 1088

**Kevin McKAY**

v.

**DEPARTMENT OF PUBLIC SAFETY and Correctional Services.**

**No. 1562, Sept. Term 2001.**

Court of Special Appeals of Maryland.

March 26, 2003.

184

Linda D. McKeegan (Keith J. Zimmerman and Kahn, Smith & Collins, P.A., on the brief), Baltimore, for appellant.

Michele J. McDonald, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Argued before ADKINS, BARBERA, RAYMOND G. THIEME, JR., (Retired, specially assigned) JJ.

BARBERA, Judge.

This appeal has its genesis in the suspension and subsequent termination of appellant, Corporal Kevin McKay, a corrections officer at the Maryland Correctional Adjustment Center ("MCAC") in Baltimore City. Appellee, the Department of Public Safety and Correctional Services ("the Department"), initially entered into a disciplinary settlement agreement ("the Agreement") with appellant that called for his one-day suspension and forfeiture of two annual leave days. Twenty-six days later, the Department rescinded that agreement and terminated appellant.

Appellant appealed to the Secretary of Budget and Management, who referred the matter to the Office of Administrative Hearings ("OAH") for decision. Following a hearing, the administrative law judge ("ALJ") upheld the termination. Thereafter, appellant petitioned the Circuit Court for Baltimore City for judicial review. That court affirmed the ALJ's decision.

Appellant noted this appeal and asks:

Did the Administrative Law Judge err, as a matter of law, by failing to decide all material issues raised by Officer McKay?

We hold that the ALJ erred in failing to rule on the legal significance of the Agreement when it decided that the Department was entitled to terminate appellant. As we shall explain, the final and binding nature of the Agreement precluded the Department from rescinding it and imposing the more severe sanction of termination. We therefore vacate the judgment of the circuit court and remand to that court with directions to remand the case to the OAH, with directions to rescind appellant's termination and to undertake further action as is necessary consistent with that rescission.

## FACTS AND PROCEEDINGS

On the morning of June 9, 2000, appellant reported for duty at MCAC. He was assigned to work in the control center of

the housing unit known as Delta Pod. Each pod at MCAC is comprised of four quads, with each quad containing six inmate cells. The control center is a glass-enclosed work area from which corrections officers control the doors to the inmates' cells and the security doors of the housing unit, and from which the officers monitor the activity of the inmates in the housing unit. The control center log indicates that between 9:10 a.m. and 9:31 a.m. on that day, six inmates were released from their respective cells to participate in indoor recreation activities.

Between 9:31 a.m. and 10:18 a.m., one of the six recreating inmates was stabbed fourteen times with a homemade weapon by one or more inmates. At approximately 10:18 a.m., a corrections officer conducting routine security rounds found the victim lying on the floor outside of the control center. The victim was unresponsive. Several corrections officers, a prison nurse, and Baltimore City Fire Department personnel tried, without success, to revive the victim. The victim was pronounced dead at 10:40 a.m. from having bled to death.

As required by departmental and institutional directives, Warden Thomas Corcoran ("the Warden") advised the Division of Correction's Internal Investigations Unit ("IIU") and the Maryland State Police ("MSP") of the homicide. Shortly thereafter, representatives from both IIU and MSP arrived at the crime scene to begin their respective investigations.

The Warden undertook an immediate investigation.[1] The Warden's investigation was independent of the IIU and MSP

---

1. Md.Code (1993, 1997 Repl.Vol.), § 11–106(a) of the State Personnel and Pensions Article provides:

*Procedure*—Before taking any disciplinary action related to employee misconduct, an appointing authority shall: (1) investigate the misconduct; (2) meet with the employee; (3) consider any mitigating circumstances; (4) determine the appropriate disciplinary action, if any, to be imposed; and (5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights. The Warden is the "appointing authority" in the case *sub judice*. Md.Code (1993, 1997 Repl.Vol.), § 1–101(b) of the State Personnel and Pensions Article. Hereinafter, all statutory references are to the State Personnel and Pension Article, unless otherwise indicated.

investigations and, in its initial hours, included conducting an examination of the crime scene, talking with the chief of security, and reviewing reports of officers at the scene and others who responded to it.

The Warden also interviewed appellant, who shared his account of the homicide. As the Warden later explained at the hearing before the ALJ, "the purpose [of the investigation] was to get a sense for what happened there, and for—if there was culpability on the part of staff to impose timely discipline in the least restrictive form necessary to send a message about the performance."

Based on the information he had gathered that day, the Warden decided that appellant's actions were negligent and constituted a breach of security, thereby warranting a three-day suspension. Before finalizing the disciplinary action, however, the Warden later that same day conducted a "mitigation conference" with appellant.[2] At this conference the Warden reviewed appellant's personnel file, which included his time of service, a weapons discharge violation, and a letter of commendation for his efforts in increasing the level of sanitation in the institution. Appellant repeated his version of events, but provided no new information for the Warden to consider.

The Warden suspended appellant for three days. The Warden gave appellant the option of using two annual leave days in place of two days of suspension. Appellant accepted this option; he agreed to a one-day suspension and forfeiture of two annual leave days in lieu of a three-day suspension. The agreement was immediately reduced to writing in a document entitled "Acceptance of Disciplinary Action Waiver of Appeal Rights." Appellant signed this document, witnessed by two individuals, the same day as the incident, June 9, 2000. Ten days later, appellant and the Warden signed a "Notice of Disciplinary Action." This document listed the charges and the discipline imposed, which was identical to that agreed upon by the parties.

---

2. *See* § 11–106(a)(3), *supra* note 1.

On July 5, 2000, twenty-six days after the incident and original suspension, the Warden notified appellant that he was rescinding the Agreement. That same day, the Warden served a notice of termination upon appellant. The Secretary of the Department agreed with the Warden's recommendation and approved appellant's termination.

In a timely fashion, appellant appealed his termination to the Secretary of Budget and Management, who referred the matter to the OAH for decision, pursuant to § 11–110(b) and Md.Code (1984, 1999 Repl.Vol.), § 10–205 of the State Government Article. Thereafter, the ALJ conducted a full evidentiary hearing and took testimony from appellant, the Warden, and several correctional officers who had been present at or responded to the scene of the stabbing.

The hearing focused on two issues: Whether the alleged actions of appellant justified termination, and whether, in any event, the Department was precluded by § 11–108(a)(2) from taking action to terminate appellant after it had agreed to and then rescinded a more lenient disciplinary sanction. As we will discuss, § 11–108(a)(2) permits the appointing authority and an employee to negotiate and agree upon a lesser disciplinary action that is "a final and binding action, not subject to any further review."

At the hearing, the Warden explained his rationale for agreeing initially to suspend appellant. The Warden testified, in particular, that appellant "may not have been doing his job for a very brief period," and "although [the incident] was so extremely serious that an inmate lost his life, [he] didn't want to go beyond the real culpability of [appellant's] performance." The Warden then testified that as "more information became available, [he] began to get quite a different picture of what went on. And it became obvious that [appellant] was way less than truthful in the description of his performance that day."

The Warden stated that, in the several weeks following the day the inmate was killed, he obtained additional information concerning appellant's conduct on the morning of the stabbing. This included that: (1) no log entries were made between 9:31

a.m. and 10:18 a.m., despite appellant's contention that he was visually scanning the pod and making the appropriate log entries; (2) the radio located in the victim's cell was blaring, indicating that appellant "must have electronically unlocked the cell, in violation of institutional procedure and policy, to afford [an inmate the] opportunity to return to the cell to turn up the radio"; (3) at the time the victim's body was discovered, four inmates were observed to be on the upper tier of the facility in violation of institutional policy; and (4) the victim's blood was in a congealed condition at the time the emergency team responded, indicating that he had been lying on the floor in front of the control center for twenty to thirty minutes.

The Warden explained that, together, this evidence demonstrated that appellant's failure to observe the inmates was not momentary, as previously thought, but continuous over a period of time. The Warden consequently determined that termination, rather than the initial discipline, was the more appropriate sanction for appellant's misconduct. After "consult[ing] the Attorney General's office and personnel," the Warden rescinded the Agreement, compensated appellant for the day he was suspended, restored the two annual leave days, and recommended to the Secretary of the Department that appellant be terminated. As we will discuss, § 11–103, upon which the Warden relied in taking this action, permits an appointing authority to impose additional disciplinary action if additional information comes to light after the initial disciplinary action was taken.

In March 2001, the ALJ issued his decision in the case. Regarding the question whether the Warden was permitted to increase the sanction initially imposed upon appellant, the ALJ stated only that "I am not aware, nor have I been directed to, any statute or law which would preclude the rescission of the initial sanctions and the imposition of a new sanction, so long as the action is timely." [3] Regarding the

---

**3.** Presumably, the ALJ's "timeliness" reference was to § 11–106(c), which states: "An appointing authority may suspend an employee without pay no later than 5 workdays following the close of the

question whether appellant had committed one or more of the charged offenses in the notice of termination, the ALJ concluded

> as a matter of law that [appellant] has violated section 11–105(8) of the Code by being wantonly careless in the performance of his duties. [Appellant] also violated the provisions of COMAR 17.04.05.04B (1) and (3) which provide that an employee may be disciplined for engaging in any of the following actions: (1) Being negligent in the performance of duties and/or (3) Being guilty of conduct that has brought or, if publicized, would bring the State into disrepute. [Appellant] also violated Standards of Conduct for his position: Standards of Care, section II, B(1), subsection J (performance of duties); subsection M (breach of duty) and subsection X (attitudes toward inmates).

Accordingly, the ALJ affirmed the Department's decision to terminate appellant.

Appellant filed a petition for judicial review in the Circuit Court for Baltimore City. The circuit court affirmed the decision of the ALJ and thereafter issued an order, without opinion, stating same. This appeal followed.

## DISCUSSION

Appellant argues that the ALJ erred in failing to determine whether the initial discipline imposed by the Department pursuant to the Agreement between the Warden and appellant was a "final and binding action, not subject to any further review," as prescribed by § 11–108. The Department responds that this issue is not preserved for appeal and that, in any event, the ALJ properly determined that the Warden had

---

employee's next shift after the appointing authority acquires knowledge of the misconduct for which the suspension is imposed." Subsection (b) of the same statute provides that "an appointing authority may impose any disciplinary action not later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed." *See also Western Corr. Inst. v. Geiger*, 371 Md. 125, 144–45, 807 A.2d 32 (2002). No challenge has been made concerning the timeliness of the Warden's disciplinary actions.

the authority to rescind the Agreement and impose the additional consequence of termination.

We hold that the issue presented in this appeal is preserved for our review. We also hold that the ALJ erred in ruling that the Department was entitled to rescind the Agreement and impose upon appellant the more severe sanction of termination.

## I.

Ordinarily, the appellate courts will not decide an issue unless the record plainly shows it to have been raised in or decided by the trial court. Md. Rule 8–131(a). The Department argues that appellant failed to preserve the issue he asks us to consider because it varies from the argument he pressed before the circuit court.

■ To be sure, the wording of appellant's contention differs on appeal from that presented below. Before this Court, appellant argues that the ALJ's failure to determine the legal effect of the Agreement in light of § 11–108(a)(2), discussed *infra*, warrants a remand to the ALJ for such a determination. In the circuit court, appellant argued that the ALJ erred as a matter of law in finding that § 11–108(a)(2) does not bar the Department from rescinding the Agreement. In both fora, appellant argues, in effect, that § 11–108(a)(2) controls this case and precluded the Department from rescinding the Agreement it had reached with appellant. We conclude that the claims are the same; thus, the issue is preserved for our consideration.

## II.

■ In deciding that the Department could rescind its prior disciplinary agreement with appellant and thereafter terminate him, the ALJ concluded that no "statute or law ... would preclude the rescission of the initial sanctions and the imposition of a new sanction." In deciding whether the ALJ was correct, we stand in the same shoes as did the circuit court in the first instance. *Gigeous v. Eastern Corr. Inst.,* 363 Md.

481, 495–96, 769 A.2d 912 (2001); *Ford v. Dep't of Pub. Safety and Corr. Servs.*, 149 Md.App. 488, 497, 817 A.2d 264 (2003) (quoting *Curry v. Dept. of Pub. Safety and Corr. Servs.*, 102 Md.App. 620, 627, 651 A.2d 390 (1994), *cert. dismissed*, 340 Md. 175, 665 A.2d 1038 (1995)). We review the decision of the ALJ, not the decision of the circuit court. *Dep't of Pub. Safety and Corr. Servs. v. Beard*, 142 Md.App. 283, 294, 790 A.2d 57, *cert. denied*, 369 Md. 180, 798 A.2d 552 (2002).

We do "not overturn the agency's factual findings or its application of law to facts if the decision is supported by substantial evidence considered in light of the record taken as a whole." *Ford*, at 497, 817 A.2d 264. When reviewing the ALJ's legal conclusions, however, "the court 'must determine whether the agency interpreted and applied the correct principles of law governing the case and no deference is given to a decision based solely on an error of law.'" *Eastern Outdoor Adver. Co. v. Mayor and City Council of Baltimore*, 128 Md.App. 494, 514, 739 A.2d 854 (1999), *cert. denied*, 358 Md. 163, 747 A.2d 644 (2000) (quoting *Richmarr Holly Hills, Inc. v. American PCS, L.P.*, 117 Md.App. 607, 652, 701 A.2d 879 (1997) (citations omitted)).

The issue in this case is solely a question of statutory interpretation. We thus review the ALJ's decision *de novo. Total Audio–Visual Systems, Inc. v. Dep't of Labor, Licensing and Regulation*, 360 Md. 387, 394, 758 A.2d 124 (2000). In doing so we do not hesitate to substitute our judgment for that of the ALJ.

" '[T]he cardinal rule of statutory construction is to ascertain and effectuate the legislative intention.'" *State v. Green*, 367 Md. 61, 81, 785 A.2d 1275 (2001) (quoting *Mayor and City Council of Baltimore v. Chase*, 360 Md. 121, 128, 756 A.2d 987 (2000)). The starting point is the language of the statute itself. *Western Corr. Inst. v. Geiger*, 371 Md. 125, 141, 807 A.2d 32 (2002); *Adamson v. Corr. Med. Servs., Inc.*, 359 Md. 238, 251, 753 A.2d 501 (2000). "[I]f the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the

specific purpose of the provision being interpreted, our inquiry is at an end." *Breitenbach v. N.B. Handy Co.*, 366 Md. 467, 473, 784 A.2d 569 (2001).

The plain meaning rule, however, is not absolute. *Tracey v. Tracey*, 328 Md. 380, 387, 614 A.2d 590 (1992); *Kaczorowski v. Mayor and City Council of Baltimore*, 309 Md. 505, 513, 525 A.2d 628 (1987). "The plain meaning rule is 'elastic, rather than cast in stone [,]' and if 'persuasive evidence exists outside the plain text of the statute, we do not turn a blind eye to it.'" *Hams of Southern Maryland, Inc. v. Nationwide Mutual Ins. Co.*, 148 Md.App. 534, 540, 813 A.2d 325 (2002) (quoting *Adamson*, 359 Md. at 251, 753 A.2d 501).

In determining the meaning of a statute, we are permitted to consider the statute's structure, including its title, and how the statute relates to other laws. *Witte v. Azarian*, 369 Md. 518, 525–26, 801 A.2d 160 (2002). We also "may consider the context in which a statute appears, including related statutes." *Geiger*, 371 Md. at 142, 807 A.2d 32. We are bound to read statutes on the same subject together, and we harmonize them to the extent possible. *Mid–Atlantic Power Supply Ass'n v. Public Serv. Comm'n of Maryland*, 361 Md. 196, 204, 760 A.2d 1087 (2000). We do this "[b]ecause the General Assembly is presumed to have intended that all its enactments operate together as a consistent and harmonious body of law." *Farmers & Merchants Nat'l Bank of Hagerstown v. Schlossberg*, 306 Md. 48, 61, 507 A.2d 172 (1986). We may consider the statute's "legislative history; . . . the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions." *Witte*, 369 Md. at 525–26, 801 A.2d 160. " 'We may also consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain. This enables us to put the statute in controversy in its proper context and thereby avoid unreasonable or illogical results that defy common sense.' " *Hams*, 148 Md.App. at 540, 813 A.2d 325 (citation omitted); *accord Medex v. McCabe*, 372 Md. 28, 38,

811 A.2d 297 (2002); *Annapolis Mkt. Place, L.L.C. v. Parker*, 369 Md. 689, 715, 802 A.2d 1029 (2002).

The Court of Appeals has cautioned, however, that when a statute is clear, resort to the legislative history is a " 'confirmatory process; it is not undertaken to contradict the plain meaning of the statute.' " *Geiger*, 371 Md. at 142, 807 A.2d 32 (quoting *Chase*, 360 Md. at 131, 756 A.2d 987).

With this framework in mind, we turn to the case *sub judice*.

### III.

The two statutes at issue are found in Title 11 of the State Personnel and Pensions Article of the Maryland Code. Title 11 sets forth policies and procedures regarding disciplinary actions, layoffs, and employment terminations of State employees. Subtitle 1 of Title 11 addresses, more specifically, "Disciplinary Actions." Section 11–103 is entitled "Miscellaneous provisions," and sets forth general provisions that may be applicable in any given disciplinary action. Subsection (b) of the statute is relevant here and reads: *"Limits on additional disciplinary action.*—After taking a disciplinary action against an employee, an appointing authority may not impose an additional disciplinary action against that employee for the same conduct unless additional information is made known to the appointing authority after the disciplinary action was taken."

There follows in the subtitle four statutes not pertinent to our analysis in this appeal. Following these provisions is § 11–108. Section 11–108 is near the end of the subtitle and reads:

(a) *Negotiation and bargaining permitted.*—This subtitle does not preclude an appointing authority and an employee from agreeing to the:

(1) holding in abeyance of a disciplinary action for a period not to exceed 18 months in order to permit an employee to improve conduct or performance; or

(2) imposition of a lesser disciplinary action as a final and binding action, not subject to any further review.

(b) *Effect of failure to appeal or failure to decide an appeal.*—

(1) If an employee fails to appeal a decision in accordance with this subtitle, the employee is considered to have accepted the decision.

(2) A failure to decide an appeal in accordance with this subtitle is considered a denial from which an appeal may be made.

(c) *Time limits negotiable.*—The parties may agree to waive or extend any time stated in this subtitle.

(d) *Resolution of appeal encouraged.*—Each party shall make every effort to resolve an appeal at the lowest level possible.

Only subsection (a)(2) is relevant to this appeal.

The Department urges that §§ 11–103 and 11–108, read together, permit what occurred here. In particular, the Department argues that § 11–108 "merely reflects the General Assembly's intention that an appointing authority and an employee may agree to lesser discipline and that, if such an agreement is reached, the disciplinary action is final and binding and may not be reviewed through the disciplinary appeal provisions of the State Personnel and Pensions Article." As we understand the Department's argument, "final," as used in § 11–108(a)(2), relates to the finality of a disciplinary action that comes about either when the employee opts not to appeal the action or when the employee does appeal and the action is upheld.

We do not read "final," as the word is used in § 11–108(a)(2), as the Department would have us do. Rather, we read the word in the context in which it is employed, that is, as part of a provision that permits the parties to circumvent the normal disciplinary process and agree to the "imposition of a lesser disciplinary action as a final and binding action, not subject to any further review." In other words, the statute provides a mechanism for expedited resolution of disciplinary

matters, should both parties agree (each for his or her own purposes) to do so.

This construction of § 11–108(a)(2) does not conflict with other provisions of the subtitle including, most particularly, § 11–103. As we have seen, that provision permits the appointing authority to impose an additional disciplinary action if (and only if) additional information is made known to the appointing authority after the initial disciplinary action was taken. The statute, quite clearly in our view, contemplates the ordinary disciplinary process wherein the appointing authority acts unilaterally to impose a disciplinary action upon an employee. Section 11–108(a)(2), in turn, addresses the more particular situation in which the parties negotiate and mutually agree upon the discipline to be imposed.

Our interpretation of the two statutes gives effect to the principle of statutory construction that "where two enactments—one general, the other specific—appear to cover the same subject, the specific enactment applies." *Beard,* 142 Md.App. at 302, 790 A.2d 57. In this case, § 11–103 is the more general and § 11–108(a)(2) the more particular of the two enactments. Thus, whenever § 11–108 is implicated, it controls over § 11–103.

Further support for our interpretation of the interplay between the two statutes is found in the first words of § 11–108(a) that *"[t]his subtitle does not preclude* an appointing authority and an employee from agreeing to," *inter alia,* the "imposition of a lesser disciplinary action." (Emphasis supplied.) We also note the statute's title, "Other procedures related to disciplinary actions," *see Witte,* 369 Md. at 525, 801 A.2d 160, and the statute's placement near the end of the subtitle, *see LaGrange v. Hinton,* 91 Md.App. 294, 304, 603 A.2d 1385 (1992) (observing that "contextual placement of a code provision is relevant for purposes of statutory interpretation"). Together, this evidences the legislative intent that § 11–108 governs the more specific situation where the appointing authority and the employee agree to a final and binding disciplinary action.

Our interpretation of these personnel provisions makes common sense. We cannot imagine that the General Assembly intended to make available a mechanism by which the appointing authority and employee can agree to a final and binding disciplinary action, and also provide, elsewhere in the same subtitle, that the appointing authority can rescind the agreement upon receipt of new information that calls into question—at least from the perspective of the appointing authority—the wisdom of the original agreement. Certainly there is nothing in the scant legislative history of these particular provisions of the personnel law that suggests anything to the contrary.[4]

Our conclusion also gives expression to § 2–301, which sets forth the purpose of the restructuring of the State's personnel system and provides, in part, that "[t]o maintain efficient and effective operations of State government, each State employee ... shall be treated with fairness in State employment." When an employee agrees to a lesser disciplinary action as a "final and binding action, not subject to any further review," fairness dictates that the employee be entitled to the assurance that the agreement cannot thereafter be modified or rescinded.

The Department urges that the construction of §§ 11–103 and 11–108(a)(2) that we here adopt would have the unintended consequence of "discouraging an appointing authority from ever resolving a disciplinary matter by executing [a disciplin-

---

4. We have reviewed the legislative history of these two provisions. Both were part of the General Assembly's extensive revision of the State Personnel Management System, the history of which we chronicled in *Western Corr. Inst. v. Geiger*, 130 Md.App. 562, 567, 747 A.2d 697 (2000), *aff'd in part, rev'd in part on other grounds*, 371 Md. 125, 807 A.2d 32 (2002). As part of the revision process, § 11–103 was substantively changed to add the language prohibiting an increase in disciplinary action "unless additional information [is] made" known to the appointing authority. Prior to this revision, an appointing authority could take additional disciplinary action against an employee only "for a good cause." Section 11–108(a)(2), however, was not substantively revised. The only revisions were a renumbering of the provision (from § 11–109 to § 11–108), and the addition of "holding in abeyance" to subsection (a)(1), which is not relevant here.

ary agreement] because, no matter how egregious the employee's conduct is later revealed to be, the appointing authority is powerless to impose appropriate additional discipline." This "failure to discipline," the Department argues, "may compromise morale, undermine the discipline necessary to the orderly administration of a paramilitary institution, suggest that the State either condones or tolerates the wrongdoing and ultimately adversely affect the public safety." We disagree.

 Doubtless, maintaining employee discipline, particularly in a paramilitary agency such as the Department, is crucial. Yet nothing we have said today undermines the Department's authority to control employee behavior. Our decision simply clarifies that whenever the appointing authority opts to negotiate with an employee for a lesser disciplinary action than might otherwise be imposed, the appointing authority may not thereafter impose an additional sanction.

We reject the Department's contention that an appointing authority would be discouraged from executing an agreement under § 11–108(a)(2) if he or she is powerless to impose additional discipline on the receipt of new information. The simple answer to the Department's concern is that there is no requirement that the appointing authority enter into a such an agreement. If, in a given situation, the appointing authority has any indication that further investigation might disclose new information about the employee's behavior, the appointing authority need not (and probably should not) negotiate a binding agreement. Regardless, the option to negotiate a lesser form of discipline rests with the appointing authority to exercise, at his discretion. Once he opts to enter into an agreement pursuant to § 11–108(a)(2), it is "final and binding," precisely as the statute dictates.[5]

---

**5.** The bargaining mechanism set out in § 11–108(a)(2) is not unlike the guilty plea mechanism available in the criminal justice system. *See State v. Brockman,* 277 Md. 687, 693, 357 A.2d 376 (1976) (discussing the utility of plea agreements). Both mechanisms provide a means of promoting the early and efficient disposition of matters involving misconduct and sanction. Both eliminate the risks, uncertainties, and practical burdens of the procedural process due the employee or

In the instant case, neither party disputes that the Warden and appellant entered into such a negotiation and reached agreement. After a meeting with appellant, the Warden offered him the opportunity to accept a one-day suspension and forfeiture of two days annual leave, in lieu of a three-day suspension. Appellant accepted this reduced discipline, as evidenced by his signature, attested to by two witnesses, on the "Acceptance of Disciplinary Action Waiver of Appeal Rights" document. The Agreement bound the Department to its terms, just as it did appellant.

The ALJ was incorrect as a matter of law when he decided that the Warden was authorized to terminate appellant. We therefore reverse the judgment of the circuit court and remand to that court with directions that the case be remanded to the OAH to rescind the termination and to take such further action as is necessary pursuant to § 11–110(d).[6]

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND TO THE OF-**

---

criminal defendant. And, both permit the respective governmental entity—whether departmental, prosecutorial, or judicial—"to concentrate their resources on those cases in which they are most needed." *Id.*

The strong public policy in favor of finality of judgments obtained as a result of a plea bargain has never been seriously called into question. *Id.* at 698, 357 A.2d 376; *accord State v. Rodriguez,* 125 Md.App. 428, 447, 725 A.2d 635, *cert. denied,* 354 Md. 573, 731 A.2d 971 (1999). The public policy that favors finality of plea bargains also favors the finality of agreements such as those contemplated by § 11–108.

6. Section § 11–110(d) provides, in pertinent part:
 *Additional action by Office of Administrative Hearings; final administrative decision.—*
 (1) Except as otherwise provided by this subtitle, the Office of Administrative Hearings may:
 (i) uphold the disciplinary action;
 (ii) rescind or modify the disciplinary action taken and restore to the employee any lost time, compensation, status, or benefits; or
 (iii) order:
 1. reinstatement to the position that the employee held at dismissal;
 2. full back pay; or
 3. both 1 and 2.

FICE OF ADMINISTRATIVE HEARINGS FOR FUR-THER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.