864 A.2d 287

## DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES

v.

### Audrey NEAL.

No. 2588, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Dec. 30, 2004.

Scott S. Oakley (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for Appellant.

Audrey J. Neal, appellee, pro se.

Panel: HOLLANDER, DEBORAH S. EYLER, JOHN C. ELDRIDGE (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

Audrey Neal, the *pro se* appellee, was automatically terminated from her employment by the Department of Public Safety and Correctional Services ("Department"), the appellant, as a Correctional Dietary Officer II, at the Maryland Correctional Institution for Women ("MCIW") in Jessup. The termination followed an incident in which Neal placed her hands around the throat of an inmate. The termination was approved by the Secretary of the Department.

Neal appealed to the Secretary of the Department of Budget and Management ("DBM"), who referred the matter to the Office of Administrative Hearings ("OAH") for a contested case hearing before an Administrative Law Judge ("ALJ"). The ALJ issued a written decision rescinding the termination, reinstating Neal, and imposing a 30–day suspension without pay. The ALJ's decision was the final decision of the DBM.

In the Circuit Court for Anne Arundel County, the Department brought an action for judicial review of the final agency decision. The court entered a judgment affirming the ALJ's decision.

On appeal, the Department presents two questions for review, which we have rephrased:

I.   Did the circuit court err by allowing Neal to participate in the action for judicial review proceeding?

II.  Did the ALJ improperly substitute her judgment for that of Neal's appointing authority by changing the discipline imposed by the appointing authority?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

On October 5, 2002, in the mid-morning, Neal and four inmates, including Kelly Ramsburg, were preparing meal trays in a small area in the MCIW dining room. As Ramsburg was working, she bumped into Neal several times. Neal told Ramsburg to slow down and be more careful. Ramsburg

apologized, but kept bumping into Neal, giggling each time. After several such bumping incidents, Neal put her hands around Ramsburg's neck, in a choking gesture, and said words to the effect of, "If I choked you, would you think it was funny or an accident?"

Neal's choking gesture was seen by another inmate, Fannie Penn, who was standing about 100 feet away.

Later that morning, Penn went to speak to Lieutenant Deborah Warren about another matter. In the course of that meeting, Penn told Lt. Warren that she had witnessed Neal put her hands around Ramsburg's neck, in a choking manner. Ramsburg then came into Lt. Warren's office and told her about the incident. Lt. Warren approached Neal and asked her about the incident, but Neal would not discuss it. Lt. Warren immediately reported the incident to Captain Jacqueline Craig, the day shift supervisor. Lt. Warren made a written report of the information she had been given.

Capt. Craig met with Ramsburg and questioned her about the incident. Ramsburg said that Neal had been "playing around" and had put her hands on her and attempted to choke in a "joking manner." Ramsburg had "laughed off" the gesture, and did not take it to mean that Neal intended her any harm. The choking gesture did not cause Ramsburg any harm. Capt. Craig inspected Ramsburg's neck and did not see any bruises or marks. She also took photographs of Ramsburg's neck, and sent her to the infirmary for a medical check, to be "on the safe side." Capt. Craig directed Ramsburg to write a statement about the incident, which she did.

Capt. Craig spoke to Penn, who repeated that she had seen Neal place her hands around Ramsburg's throat. From her position, Penn could not see the expression on Neal's face, and her view of Ramsburg was partially blocked. She thought Ramsburg looked surprised, however. Penn also gave a written statement about the incident.

Capt. Craig interviewed Neal, who was cooperative. Neal acknowledged that, after Ramsburg bumped into her several times and giggled, she put her hands on Ramsburg's throat.

At Capt. Craig's request, Neal prepared a written report of the incident, which was several pages long. She wrote that she had placed her hands near Ramsburg's throat, in a "choking motion," and had said, "[I]f I choked you would you think it was funny or an accident?" Neal further wrote that she did not apply any pressure to Ramsburg's neck, even though she did touch her neck.

Nurse Campbell examined Ramsburg and did not find any bruises or marks. She prepared a brief report.[1]

That same day, Capt. Craig prepared a memorandum to Chief Marcia Fair about the "alleged choking incident." She recounted what had been reported to Lt. Warren by Penn and Ramsburg and what Neal had told her had happened. Capt. Craig stated,

> In conclusion, I find that Sgt Neal may not have acted in a hostile or malicious manner when she placed her hands on or near the throat of inmate Kelly Ramsburg. Both inmate Ramsburg and Sgt Neal's written statement are consistent in that regard[ ], however Neal's own statement clearly indicates that she acted in a very extreme, unprofessional and unruly manner. I also find that Sgt Neal was very negligent in controlling inmate Ramsburg. Sgt Neal contributed to inmate Ramsburg's disruptive, negative and escalating behavior by failing miserably to take the appropriate disciplinary action.

The reports and statements about the incident were forwarded to Marsha Maloff, Warden of MCIW. Warden Maloff has been employed by the Department for over 30 years, and has been in a management position since 1979. At the time of the incident, she had been warden of MCIW for three and one-half years.

Warden Maloff was not familiar with Neal, because Neal only had started working at MCIW on August 7, 2002, about two months before the incident. Warden Maloff considered the incident to be "a serious violation of standards that the

---

1.  Nurse Campbell's first name is not in the record.

Standards call for termination of employment," and therefore obtained Neal's personnel records from the Maryland House of Corrections ("MHC"), where Neal had worked before starting at MCIW, and from Patuxent Institution ("Patuxent"), where she had worked prior to then, to review her disciplinary history.

Warden Maloff prepared a report, on October 17, 2002, detailing the contents of Neal's personnel record. The records showed an employment start date in 1999, as a Correctional Dietary Officer II, at Patuxent.[2] In March 2002, Neal was promoted to Correctional Dietary Supervisor at MHC. She was then rejected from that position during the probationary period, and demoted to her former position. Because there was no opening for a Correctional Dietary Officer II at MHC, Neal was transferred to MCIW, where there was such an opening.

In addition to the rejection on probation, Neal's record showed, for the period of 12 months prior to October 5, 2002, the following:

- 6/20/02 at MHC: Level I reprimand for Personal Conduct, Performance of Duty and Insubordination.

- 6/16/02 at MHC: Level I reprimand for Gross Lateness and Unscheduled Leave.

- 6/13/02 at MHC: Counseling for Insubordination and Performance of Duty.

- 6/11/02 at MHC: Counseling for Performance of Duty.

- 1/11/02 at Patuxent: Level II reprimand for Unprofessional Conduct and Use of Profanity.

The record also showed that, before January 2002, Neal had been disciplined for five infractions at Patuxent, from March 27, 2001, to August 14, 2001, including a Level I reprimand, two Level II reprimands, a one-day suspension for gross

---

2. Neal first had been employed by the Department in 1985, but left State employment in 1989. She resumed State employment in 1999.

lateness, and a forfeiture of 5 days annual leave in lieu of suspension.

Warden Maloff found Neal's disciplinary history "appalling" and concluded that Neal "should have never been promoted and should have been fired at least 1 year ago."

On October 18, 2002, Warden Maloff held a mitigation conference with Neal, to give her the opportunity to explain her conduct on October 5. According to Warden Maloff, Neal admitted having touched Ramsburg's neck and that she had not been trained to address inmate behavior problems in such a fashion. At the conclusion of the conference, Warden Maloff announced that she was going to recommend to the Department Secretary that Neal be terminated. That day, Warden Maloff issued a Notice of Termination ("Notice"), discharging Neal effective October 31, 2002.

The Notice alleged that Neal was subject to automatic termination, under Md.Code (1997 Repl.Vol.), subsections 11–105(1)(iii) and (8) of the State Personnel and Pensions Article ("SPP"), which provide:

The following actions are causes for automatic termination of employment:

(1)intentional conduct, without justification, that ... (iii) seriously threatens the safety of the workplace.

. . .

(8) wantonly careless conduct or unwarrantable excessive force in the treatment or care of an individual who is a client, patient, prisoner, or any other individual who is in the care or custody of this State.

It further alleged that Neal had violated Code of Maryland Regulations ("COMAR") section 17.04.05.04 (Disciplinary Actions Relating to Employee Misconduct), promulgated under SPP Title 11, by: 1) negligently performing her duties; 2) engaging in conduct that if publicized would bring the State into disrepute; and 3) being unjustifiably offensive in her conduct toward fellow employees, wards of the State, or the public.

The Notice went on to state that Neal had violated several Department standards included in the "Standards of Conduct and Internal Administrative Disciplinary Process" ("Standards"): 1) conduct unbecoming an employee of the Department (Standard II.B.1); 2) unprofessional working relationship with coworkers, supervisors, or subordinates (Standard II.B.2); 3) offensive conduct toward other employees, inmates, supervisors, offenders, clients, or members of the public (Standard II.B.3); and 4) use of physical force upon an inmate except in self-defense, in defense of others, or to prevent escape, serious disturbance, or to control an unruly inmate (Standard II.Y).

The Notice further explained that Neal's conduct was being charged as a First Category Infraction, "Inadequate or unsatisfactory job performance," under Standard IV.E.1(a)(5); and as a Third Category Infraction, "Use of unnecessary force which could reasonably be expected to result in serious bodily harm or death," under Standard IV.E.3(a)(7). Referring to SPP subsections 11–105(1)(iii) and (8), quoted *supra*, and Standard IV.E.(3)(b), the Notice stated that "Third category infractions shall result in termination from State service."

In the Notice, Warden Maloff gave the following written explanation for Neal's termination for the October 5, 2002 incident:

> [Neal's] actions constitute conduct unbecoming a Correctional Dietary Officer and the excessive use of force. Such conduct on the part of a Correctional Dietary Officer seriously threatens the safety of the inmate as well as the workplace, and if publicized, would bring the Department into disrepute. [Neal's] actions constitute a Third Category infraction under the Standards of Conduct and an automatic ground for the termination of her employment. Her inappropriate conduct and her disciplinary history support the proposal to terminate her employment with this Department.

The Secretary signed the Notice on October 31, 2003. The DBM issued an unsatisfactory report of service reporting the

termination on November 4, 2003. Neal filed a timely challenge to the termination with the Department Secretary, and appealed to the DBM Secretary. Pursuant to SPP section 11–110(b)(1)(ii), the DBM Secretary transmitted the appeal to the OAH, for a contested case hearing.

The hearing was held on April 8, 2003. Warden Maloff, Capt. Craig, and Lt. Warren testified on behalf of the Department. All the reports and statements prepared about the incident were introduced into evidence by the Department, as were the personnel records for Neal that Warden Maloff reviewed prior to issuing the Notice.

Neal testified on her own behalf.[3] She said that she did not actually touch Ramsburg's neck, but just placed her hands near it, in a choking gesture. She did not call any witnesses or introduce any documents into evidence.

On May 19, 2003, the ALJ issued a written decision stating her factual findings, setting forth the applicable law, and applying the law to the facts.

The ALJ found that, regardless of whether Neal actually touched Ramsburg's neck, she did not use force against Ramsburg; did not intend to use force against or injure Ramsburg; and in fact did not cause any injury to Ramsburg. The ALJ further found that Neal's conduct was "horseplay," as Capt. Craig had characterized it, that was unprofessional but did not involve the use of force (excessive or otherwise) and did not seriously threaten the safety of the workplace. On that basis, the ALJ determined that the evidence did not support an automatic termination under SPP section 11–105(1)(iii) or (8); did not support a finding of conduct prohibited by Standard II.Y (use of physical force upon an inmate except in self-defense, in defense of others, or to prevent escape, serious disturbance, or to control an unruly inmate); and did not

---

**3.** Neal was represented at the contested case hearing by Herbert Berry, Jr., a Labor Relations Representative for the Maryland Correctional Law Enforcement Union.

support a finding of a Third Category Infraction under Standard IV.E.3.(a)(7).

The ALJ further found that Neal's conduct was not a violation of Standard II.B.2 (unprofessional working relationships with other employees), because Ramsburg was not an employee; and was not a violation of Standard II.B.3 (conduct offensive to community standards), because it was "horseplay" that was not offensive to Ramsburg or any of the officers immediately involved in investigating it. The ALJ found, however, that Neal's conduct had been unprofessional and therefore was a violation of Standard II.B.1 (conduct unbecoming). Neal's actions also constituted "unjustifiably offensive" conduct toward Ramsburg, a ward of the State, in violation of COMAR 17.04.05.04(4). Pursuant to Standard IV.E.1(a), the unprofessional and offensive conduct was a First Category Infraction.

Having found the evidence legally insufficient to support the Department's automatic termination of Neal, the ALJ reversed the termination, reinstated Neal, and imposed a four-week suspension, without pay. It was that aspect of the ALJ's decision, and only that aspect, that the Department challenged in the action for judicial review, and again challenges in this Court. We shall set forth the reasons given by the ALJ in imposing the suspension in our discussion of Issue II.

Pursuant to SPP section 11–110(d)(3), the ALJ's decision, as the decision of the OAH, became the final agency decision. As stated above, the Department pursued an action for judicial review, which resulted in a judgment by the circuit court affirming the final agency decision. The Department then noted this appeal.

## DISCUSSION

### I.

■ The Department contends that Neal should not have been permitted to participate in the judicial review action, because she abandoned her status as a party to that action.

■ It is unclear what relief the Department seeks in pursuing this contention. The Department does not argue, and there would be no basis to argue, that an abandonment by Neal of her party status in the judicial review action would have worked a change in the standard of review applied by the circuit court, or would have had any impact on the circuit court's ruling. Moreover, on appeal in this Court, we do not review the circuit court's ruling, but review directly the final agency decision, *see McKay v. Dep't of Public Safety,* 150 Md.App. 182, 193, 819 A.2d 1088 (2003), and the Department does not argue, and also would have no basis to argue, that our standard of review would be affected by an abandonment of party status by Neal in the circuit court. Also, the Department does not argue that Neal has lost her right to participate as a party in this Court.

In any event, the Department's contention is without merit. The Department filed its petition for judicial review on June 16, 2003, and mailed notice to Neal that day. The OAH filed a certificate of compliance, in accordance with Rule 7–202(e), on June 27, 2003. Neal did not file a response to the petition within 30 days after June 16, 2003, as required by Rule 7–204(c).

On July 28, 2003, the Department filed a motion for stay of the ALJ's decision, under Rule 7–205. On August 13, 2003, Neal, acting *pro se,* filed an opposition to the motion to stay, arguing that the Department was violating the ALJ's decision by not returning her to duty with back pay and benefits. Neal's opposition addressed why, in her view, it was unlikely that the Department would prevail in the judicial review action.

On August 18, 2003, the Department filed a reply to Neal's opposition, and a Rule 7–207 memorandum.

The circuit court issued an order on August 29, 2003, granting in part and denying in part the Department's motion for stay. The order stayed that part of the ALJ's decision awarding Neal reimbursements and benefits, from November 30, 2002, to August 31, 2003, and for the pendency of the

circuit court proceedings. Thus, the Department remained obligated under the ALJ's decision to return Neal to work.[4]

Neal did not file a Rule 7–207 memorandum.

The court held a hearing on October 15, 2003. The Department was represented by counsel, and Neal appeared on her own behalf. At the outset of the proceeding, the Department moved to preclude Neal from participating, on the ground that she had not filed a response to the petition for judicial review, and therefore was not a proper party to the case. The Department further argued that, even if Neal was a proper party, she should not be allowed to be heard in oral argument, because she did not file a Rule 7–207 memorandum.

Neal responded that she had filed an opposition to the motion to stay, but nothing else.

The judge denied the Department's motion, stating:

The Court is going to permit the Respondent to participate. The Court finds that at least with respect to the Respondent's response to motion to stay that there is sufficient information in there in order to put the Department on notice as to what essentially the arguments are that are going to be raised by the Respondent. So I am going to allow Ms. Neal to be heard.

The Department argues that Neal abandoned her party status by not filing a timely response to the petition under Rule 7–204, and that for that reason the circuit court erred by allowing her to participate in the judicial review action as a party. Moreover, the Department asserts, even if Neal properly was allowed to maintain her party status, the court abused its discretion in allowing her to make an oral argument at the hearing, because she did not present a Rule 7–207 memorandum.

Rule 7–204, entitled **"Response to petition,"** states, in relevant part:

---

4. This Court extended the partial stay for the pendency of the appeal.

(a) **Who may file; contents.** Any person, including the agency, who is entitled by law to be a party and who wishes to participate as a party *shall file a response to the petition.* The response shall state the intent to participate in the action for judicial review. No other allegations are necessary. . . .

(c) **Time for filing response; service.** A response shall be filed within 30 days after the date the agency mails notice of the filing of the petition *unless the court shortens or extends the time.* The response need be served only on the petitioner, and shall be served in the manner prescribed by Rule 1–321.

(Emphasis added.)

Neal plainly had party status when the petition was filed. (The Department does not argue otherwise.) She did not file a timely response to the petition, however. As the ruling quoted above makes plain, the circuit court treated Neal's opposition to the Department's motion to stay as a late-filed response to the petition by a person entitled to be a party.

In *Colao v. County Council of Prince George's Co.,* 109 Md.App. 431, 675 A.2d 148 (1996), *aff'd,* 346 Md. 342, 697 A.2d 96 (1997), we recognized that Rule 7–203, which governs the time for filing a petition for judicial review, does not confer discretion on the circuit court to accept an untimely filed petition, and therefore operates as a statute of limitations. Unlike Rule 7–203, however, Rule 7–204 expressly grants the court discretion to extend the time for filing a response to the petition; and the language of Rule 7–204 does not preclude the court from exercising that discretion to extend the filing deadline retroactively, after it has passed.

Accordingly, the circuit court in this case had discretion to extend the deadline for Neal to file her response to the petition and to do so retroactively. In addition, the court had discretion to treat Neal's opposition to the motion to stay as a response, under Rule 7–204. That rule provides at subsection (a) that a response merely "shall state the intent [of the person filing it] to participate in the action for judicial review.

No other allegations are necessary." Neal's opposition to the Department's motion to stay made plain that she intended to participate in the action.

■ The court did not abuse its discretion in treating Neal's opposition as a late-filed response. Neal was entitled to party status when the judicial review action was filed. She was not represented by counsel. Her opposition to the motion to stay was filed fewer than four weeks after a response was due and before the Department's date for filing its Rule 7–207 memorandum. In addition, the opposition was filed almost two months before the scheduled oral argument. Contrary to the Department's argument, Neal did not act so as to abandon her party status. By filing an opposition to the motion to stay and appearing at the October 15, 2003 hearing, she acted to maintain, not abandon, her party status.

■ Finally, the court also did not abuse its discretion in allowing Neal to present oral argument at the hearing. A respondent in an action for judicial review may, but need not, file a Rule 7–207 memorandum. *See* Rule 7–207(a) (stating that a petitioner "shall file a memorandum" setting forth the questions presented, a statement of material facts, and legal argument, and that a respondent in the action "may file an answering memorandum in similar form" within 30 days after service of the petitioner's memorandum). Under subsection (d) of that rule, entitled "**Sanctions for late filing of memoranda**," "[a] person who has filed a response but who fails to file an answering memorandum within the time prescribed by this Rule may not present argument except with the permission of the court." Thus, a respondent who has not filed an answering memorandum, or who has filed such a memorandum late, is not entitled to present argument to the court; but the court has discretion to allow the respondent to do so.

In the case at bar, Neal's opposition to the motion to stay included arguments that ordinarily would be set forth in a memorandum under Rule 7–207. The opposition was filed well before the hearing, so as to give the Department notice of Neal's arguments before the hearing and an opportunity to file

a reply memorandum in answer to her arguments. Clearly, there would be no prejudice to the Department from Neal's being permitted to appear and present oral argument to the court. Under the circumstances, it was reasonable for the court to grant Neal permission to present oral argument, and the court's ruling was not an abuse of discretion.

## II.

■ The Department contends that the ALJ exceeded her authority and acted in an arbitrary and capricious manner in imposing a disciplinary sanction of one-month suspension without pay. Before setting forth the reasoning employed by the ALJ in imposing the one-month suspension and explaining the Department's argument in more detail, some legal background information, beyond what we already have provided, is in order.

Section II of the Department's Standards sets forth the standards of conduct and performance for Department employees. Section IV of the Standards establishes disciplinary sanctions for infractions. Paragraph E of that section divides unacceptable behavior into three categories of infraction—First Category, Second Category, and Third Category—and describes the type of discipline to be imposed for each.

Standard IV.E.1.(b) sets forth a progressive discipline schedule for First Category Infractions:

First category infractions shall result in discipline according to the following schedule and shall be dependent on the number of occurrences within the twelve months prior to the subject offense.

1) First Offense: Documented Counseling/Training

2) Second Offense: Level 1 Reprimand

3) Third Offense: Level 2 Reprimand

4) Fourth Offense: 5 day suspension

5) Fifth Offense: Charges for Removal (In situations where the employee is allowed to work pending the charges, a

minimum of a five day suspension shall be levied in addition to the filing of Charges for Removal.)

In Standard IV.E.2.(b), a more severe progressive discipline schedule is set forth for Second Category Infractions, starting with a Level 1 Reprimand for the first such offense in the twelve-month reckoning period and culminating in Charges for Removal upon the fourth such offense. (The sanction for an employee who commits a Second Category Infraction after having committed a First Category Infraction is the next step in progressive discipline for a Second Category Infraction above that imposed for the First Category Infraction.) As stated above, termination is the disciplinary sanction for a Third Category Infraction. Standard IV.E.3(b) ("Third category infractions shall result in termination from State service.").

The Standards allow, however, for mitigating circumstances to be taken into account when a disciplinary sanction is decided. Section IV.D., entitled "Mitigating Circumstances," states:

> Mitigating circumstances include those conditions which indicate that the employee is not wholly at fault. When in the judgment of the appointing authority or designated representative that mitigating circumstances exist and can be substantially documented, specific corrective action may be reduced or not invoked.

Also as explained above, SPP section 11–105 sets forth certain causes for automatic termination of employment.

Chapter 5, Subtitle 4 of Title 17 of COMAR contains regulations promulgated pursuant to SPP Title 11, governing "Disciplinary Actions" within the DBM. After setting forth in general the disciplinary actions that may be taken by the DBM for unsatisfactory performance or misconduct, under SPP Title 11, *see* COMAR 17.04.05.01, the regulations expressly allow consideration of mitigating circumstances. COMAR 17.04.05.02 states, in relevant part:

> A. Scope. This regulation applies to an employee in the skilled and professional services....

B.  Consideration of Mitigating Evidence.  Except for automatic terminations under [SPP section 11–105], the appointing authority, head of the principal unit, the Secretary, and the Office of Administrative Hearings shall consider mitigating circumstances when determining the appropriate discipline.

C.  The Office of Administrative Hearings may not change the discipline imposed by the appointing authority, as modified by the head of the principal unit or Secretary, unless the discipline imposed was clearly an abuse of discretion and clearly unreasonable under the circumstances.

Neal was employed as a member of the skilled service. Warden Maloff was her "appointing authority." The Department Secretary was the head of her principal unit. Her appeal from the termination decision that was made by Warden Maloff and approved by the Secretary was to the DBM Secretary, under SPP section 11–110, who, as explained, referred the matter to the OAH to decide, by means of a contested case hearing before an ALJ.

In an appeal to the DBM Secretary that is referred to the OAH, the OAH is to dispose of the appeal or conduct a contested case hearing in accordance with Title 10, Subtitle 2 of the State Government Article.  SPP § 11–110(c)(2).  The OAH is "bound by any regulation, declaratory ruling, prior adjudication, or other settled, preexisting policy, to the same extent as the Department is or would have been bound if it were hearing the case."  *Id.*  With exceptions not herein applicable, the OAH may take additional action in the case to

(i) uphold the disciplinary action;  (ii) rescind or modify the disciplinary action taken and restore to the employee any lost time, compensation, status, or benefits;  or (iii) order:  1. reinstatement to the position that the employee held at dismissal;  2. full back pay;  or 3. both 1 and 2.

SPP § 11–110(d)(1).  As noted above, the decision of the OAH is the final administrative agency action.  SPP § 11–110(d)(3).

In this case, the ALJ considered the evidence adduced at the hearing and determined that it supported a finding that

Neal had engaged in unprofessional conduct that was offensive, in violation of Standard II.B.1, a First Category Infraction, and COMAR 17.04.05.04(4). The ALJ further determined that the evidence did *not* support a finding that Neal had engaged in the alleged conduct warranting automatic termination under SPP section 11–105 (intentional conduct, without justification, that seriously threatened the safety of the workplace or unwarranted excessive force in the treatment of an inmate) or in conduct constituting a Third Category Infraction.

Upon those findings, the ALJ proceeded to fashion a disciplinary sanction for the First Category Infraction. She reviewed and took into account the evidence showing the prior infractions by Neal during the one-year reckoning period and the sanctions that had been imposed for those infractions. She also reviewed and took into account Neal's work history with the Department, including the disciplinary sanctions that had been imposed prior to the 12–month reckoning period. Finally, she reviewed the Department's Standards. The ALJ decided to reinstate Neal with a one-month suspension, explaining:

> [Neal] was guilty of a first category infraction. First category infractions subject an employee to charges for removal for the fifth offense within a twelve month period. [Neal] was disciplined for first category infractions three times in twelve months prior to the October 5, 2002 incident, and twice for second category infractions. While the evidence does not support automatic termination ..., under the progressive discipline regulations, [Neal's] history rendered her subject to charges for removal for an additional first category offense.... In fact, she could have received much more severe sanctions for her earlier offenses than she did. Those offenses, however, were all committed prior to her transfer to MCIW, and the responsible authorities, in their discretion, decided on the lesser sanctions.
>
> It is of interest, also, that during the same twelve month period, she was promoted (although subsequently demoted), after she had received a Level II reprimand for unprofes-

sional conduct and use of profanity, and that the most severe discipline for the subsequent infractions was a Level I reprimand. While Warden Maloff opined that [Neal] should not have been promoted, but should have been terminated prior to her transfer to MCIW, she was not the person investigating or weighing the facts in the other incidents. Those who were closer to the situations had a different view, and their decisions are due deference.

It is thus inconsistent with the progressive discipline concept for the first category infractions charged as a result of the "choking" incident to result in termination. Capt. Craig, who conducted the investigation at MCIW, did not see fit to charge [Neal] at all. At the same time, [Neal's] disciplinary history is very poor, and requires a sanction which recognizes the seriousness of continuous violations of applicable work rules.

For these reasons, I will reverse the termination. Considering that this is her first suspension in the recognition period, that the infraction is not more egregious than her prior infractions, but that it is her sixth infraction in that period, I will order a one month suspension without pay.

The Department first argues that the ALJ's sanction decision violated COMAR 17.04.05.02, and therefore was beyond her authority to impose, because she changed the discipline imposed by Warden Maloff, as the appointing authority, without finding that it was "clearly an abuse of discretion and clearly unreasonable under the circumstances." The Department points out that the ALJ's written decision makes no reference to COMAR 17.04.05.02 and does not state that the sanction of termination was unreasonable or an abuse of discretion by Warden Maloff. The Department complains that the ALJ merely substituted her own sanction for that imposed by the warden, which she is not authorized to do.

The ALJ's decision that the evidence did not support any of the factual bases underlying automatic termination of Neal from employment amounted to a decision that the sanction of automatic termination was unreasonable. Notwithstanding

that the Notice included charges in addition to those that would support automatic termination under SPP section 11–105 and under Standard IV.E.3(b), for a Third Category Infraction, Neal in fact was terminated automatically. The warden's statement of reasons in the Notice made that plain. Obviously, when the sanction of automatic termination under SPP section 11–105 or for a Third Category Infraction is imposed but a necessary factual predicate for the sanction does not exist, the sanction is unreasonable. It was not necessary for the ALJ to say that expressly; it was implicit in her decision. *See Ward v. Dept. of Public Safety & Correctional Services,* 339 Md. 343, 353 n. 5, 663 A.2d 66 (noting that there must be sufficient evidence of an infraction under the Standards to prevent the charges of removal from being overturned on appeal); *see also T–UP, Inc. v. Consumer Protection Div.,* 145 Md.App. 27, 47, 801 A.2d 173 (2002) (noting that a reviewing court must defer to an ALJ's "fact-finding and drawing of inferences if they are supported by the record") (quoting *Board of Physician Quality Assur. v. Banks,* 354 Md. 59, 68, 729 A.2d 376 (1999)).

The Department next argues that Neal was not terminated from employment solely under SPP section 11–105 or for a Third Category Infraction, but also was terminated for committing a First Category Infraction that was her sixth offense, including First and Second Category offenses, in the 12–month reckoning period. Under Standard IV.E.1.(b)(5), a fifth such offense "shall result" in Charges for Removal. The Department maintains that the ALJ did not find that termination as a sanction for the sixth in a series of First/Second Category Infractions in the 12–month reckoning period was unreasonable or a clear abuse of discretion; and therefore the ALJ acted in violation of COMAR 17.04.05.02(C) and without authority by substituting a one-month suspension for the termination.

This argument does not have merit because its premise is faulty. The warden terminated Neal automatically under SPP section 11–105 and for committing a Third Category Infraction; she did not also terminate Neal on the alternative

ground that Neal had committed a sixth First Category Infraction in the prior 12–month period. As stated above, the explanation for termination given by Warden Maloff in the Notice makes plain that Neal was automatically terminated under SPP and for a Third Category Infraction.

Under SPP section 11–110(c)(2) and State Government Article Title 10, Subtitle 2, the ALJ was tasked with deciding the disciplinary charges against Neal in a contested case, hearing in which the ALJ was the fact-finder. The ALJ determined, based on the evidence adduced at the hearing, that the facts on which Neal's automatic termination was based were not proven and the termination therefore was not justified. Under SPP section 11–110(d)(ii) and (iii), the ALJ was authorized to rescind the termination and reinstate Neal to her former position with full back pay. The ALJ then made her own factual finding on the evidence presented that Neal had committed a First Category Infraction. Under SPP section 11–110(d), the ALJ was authorized to impose a sanction for that infraction. The sanction could be a modification of the sanction previously imposed, that is, the automatic termination, based on the ALJ's own assessment of what an appropriate sanction would be. Moreover, the ALJ was authorized, under COMAR 17.04.05.02(B), to consider mitigating circumstances in deciding the appropriate sanction.

The ALJ took into account the progressive discipline regulations, under which charges of removal are to be filed for a person committing a fifth First or Second Category Infraction in a one-year period. She considered the non-serious "horse-play" nature of Neal's conduct and that the sanctions imposed for prior infractions Neal had committed that year had been more lenient than what they could have been. She concluded that termination would not be in keeping with the progressive discipline scheme: the offense was not serious misconduct and the sanctions for prior infractions were lenient so as not to be leading to termination for a next offense. In this way, the ALJ factored mitigating circumstances into her discipline decision, which she had authority and discretion to do.

The Department also argues that under SPP section 11–110(d) and Standards section IV, even if the ALJ had the authority to impose a sanction other than that which was imposed by the warden (which as we have explained, she did), she could not impose a one-month suspension. We disagree. The ALJ was authorized to impose a modified sanction from the termination that was imposed by the warden. The sanction of a one-month suspension without pay is a lesser sanction than the termination sanction imposed by the warden. Accordingly, it is a modification of the termination, which the ALJ was authorized to impose.

Finally, the Department argues that the ALJ acted arbitrarily and capriciously by imposing a one-month suspension without pay, instead of imposing the greater sanction of termination. "If there is some evidence pointing in each direction, the issue is, by definition, 'fairly debatable,' and the decision of the [ALJ], whichever way it goes, may not be reversed on judicial review as having been arbitrary or capricious." *Futoryan v. Mayor and City Council of Baltimore,* 150 Md.App. 157, 172, 819 A.2d 1074 (2003); *see also Giant Food, Inc. v. Dept. of Labor, Licensing and Regulation,* 356 Md. 180, 185, 738 A.2d 856 (1999).

For the reasons we have explained, the ALJ's sanction decision was reasonable. She took into account the quality of the offense, that is, that it did not involve serious misconduct; that it was the sixth First or Second Category Infraction in one year; and that sanctions for prior offenses did not presage termination for a next, similar category offense. Weighing those considerations, the ALJ determined that a one-month suspension without pay was a sanction that was not too harsh but not too lenient, that is, was appropriate. The ALJ's decision-making was thoughtful, and certainly was not arbitrary or capricious.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY THE APPELLANT.**